STATE of Iowa, Appellee,

v.

**Tammy Jo REINIER, Appellant.**

**No. 99–1963.**

Supreme Court of Iowa.

May 31, 2001.

**462**

Linda Del Gallo, State Appellate Defender, and David Arthur Adams, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kevin Cmelik, Assistant Attorney General, John P. Sarcone, County Attorney, and Stephanie Cox, Assistant County Attorney, for appellee.

CADY, Justice.

This case presents the question whether a warrantless entry of a home by police officers based upon a "knock and talk" investigative encounter with the home-owner followed by a full search of the home conducted pursuant to the consent of the homeowner violated the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. The district court found both the initial entry into the home by police and the subsequent search were accomplished by voluntary consent. The court of appeals determined the initial entry into the home by police was illegal, but the subsequent search was done with voluntary consent. On our review, we conclude the illegal entry into the home, in combination with the other surrounding circumstances, rendered the consent to search involuntary. We vacate the decision of the court of appeals, reverse the district court, and remand the case to the district court for further proceedings.

## I. Background Facts and Proceedings.

In late November 1998, Des Moines police received a complaint of drug activity at a Kwik Shop on the east side of Des Moines. The complaint indicated Tammy Reinier, a Kwik Shop employee, was selling drugs. Two officers from the vice and narcotics unit of the police department were assigned to investigate the complaint. The officers initiated their investigation by conducting a surveillance of Reinier's home. Over the course of a week, however, they were unable to observe any evidence of drug activity at the house. The officers then decided to conduct a "knock and talk" investigation of Reinier's home.

On December 2, 1998, at approximately 6:00 p.m., the officers approached Reinier's house and knocked on the front door. They wanted to determine if Reinier would talk about the complaint and give them consent to search her house for evidence of drug activity.

The front door of Reinier's house included a screen door which opened out and a heavy solid wood door which opened into a room described as a porch. The wood door was secured with a deadbolt lock. The outside walls of the porch had the

same siding as the remainder of the house and the roof of the porch also conformed to the roof of the remainder of the house. The porch had glass-encased windows with blinds. There was another heavy wooden door which led from the porch area into the living room of the home.

The officers were not in uniform at the time of the "knock and talk" encounter. It was dark outside. One of the officers carried a consent-to-search form attached to a clipboard.

When Reinier walked into the porch to open the front door, she closed the door leading to the living room to prevent her dog from coming onto the porch. She then opened the wooden door to the porch. The officers felt Reinier invited them into the porch by opening the door. They described Reinier as opening the door "wide." Without asking to enter, the two officers stepped inside the porch.[1] As they entered, Reinier appeared curious and surprised at their presence. The officers then identified themselves as Des Moines police and explained to Reinier that they were investigating a narcotics complaint involving methamphetamine. One of the officers told Reinier they preferred to investigate drug complaints by going to the suspect's home and, instead of obtaining a warrant, simply looking around the house to rule out bogus or petty use complaints. The officers further indicated they were concerned with major drug dealers and drug labs, and asked Reinier if they could look around her house and search the basement for a drug lab. Before Reinier responded, one of the officers also asked if she had any drugs or drug paraphernalia in the house. She acknowledged that she did. The officers reiterated that they were not concerned about the

petty use of drugs and again asked to look through the house. The officers also told Reinier that because she had acknowledged that there were drugs inside, they now had probable cause to apply for a warrant. Reinier consented to a search.

The officers then asked Reinier if they could go into the living room where there was more light. Reinier invited the officers into the living room. The officers immediately observed a scale and a bag of methamphetamine on the coffee table when they walked into the living room. One of the officers read the written consent form to Reinier and she signed the form after again reading it herself. A subsequent search of the house revealed additional drugs other than those observed in the living room.

Reinier was charged with two counts of possession of a controlled substance with intent to deliver, conspiracy to deliver drugs, possession of marijuana, and failure to possess a drug tax stamp. She moved to suppress the drugs found in her home. The district court denied the motion and the case proceeded to a bench trial. The court found Reinier guilty of all charges except the conspiracy count and sentenced her to a term of incarceration not to exceed twenty-five years on each of the two possession with intent to deliver counts, in addition to shorter prison terms on the other drug offenses, to be served concurrently.

Reinier appealed. We transferred the case to the court of appeals, which determined that the district court correctly denied the motion to suppress because the search of the home was accomplished by voluntary consent. We granted further review.

[1]. There was no direct evidence either at trial or at the suppression hearing to explain how the screen door was opened, or who opened it. The evidence implies, however, that the officers had opened the screen door before Reinier opened the wooden door.

## II. Scope of Review.

We employ a de novo review when resolving issues involving constitutional claims. *See State v. Campbell,* 326 N.W.2d 350, 352 (Iowa 1982). The record we consider includes both the evidence from the trial as well as from the suppression hearing. *State v. Vincik,* 436 N.W.2d 350, 353 (Iowa 1989).

## III. Search of the Premises.

Law enforcement officials pursue a variety of investigative techniques in an effort to gather information in the course of investigating crimes and complaints of crimes, including searching property for evidence of criminal activity. While courts recognize the vital need for law enforcement agencies to gather information and evidence of crimes and to utilize new techniques and technology to do so, the Fourth Amendment exists to protect the right of the people to be free from unreasonable searches and seizures by government officials and limits the means police can use to gather evidence. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This same fundamental right of privacy is found in article I, section 8 of the Iowa Constitution.

It is axiomatic that the chief evil sought to be addressed by the Fourth Amendment was the physical entry of the home. *United States v. United States Dist. Ct.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972). Although the Fourth Amendment protects the privacy of an individual in a variety of settings, none is "more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639, 653 (1980). The special sanctity of the home has deep roots in our history, and "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" lies at the very core of the Fourth Amendment. *Id.* at 589–90, 100 S.Ct. at 1382, 63 L.Ed.2d at 653 (citation omitted). Thus, "[i]t is a 'basic principle of Fourth Amendment law' that [all] searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, 100 S.Ct. at 1380, 63 L.Ed.2d at 651 (citation omitted); *see Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732, 742 (1984).

The principal protection against the unreasonable intrusion into a home by government officials is the warrant requirement of the Fourth Amendment. *See United States Dist. Ct.,* 407 U.S. at 313, 92 S.Ct. at 2134, 32 L.Ed.2d at 764. The judicial scrutiny required for the issuance of a warrant helps minimize the risk of unreasonable intrusion into the privacy of a home. *Payton,* 445 U.S. at 585, 100 S.Ct. at 1379–80, 63 L.Ed.2d at 650. Thus, searches of homes conducted outside the judicial process are per se unreasonable and will not be sanctioned, "subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971) (citation omitted).

One well-established exception to the warrant requirement is a search con-

ducted by consent.[2] *Schneckloth v. Busta-monte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854, 858 (1973). A warrantless search conducted by free and voluntary consent does not violate the Fourth Amendment. *See id.; State v. King,* 191 N.W.2d 650, 655 (Iowa 1971).

■■■■■ Consent is considered to be voluntary when it is given without duress or coercion, either express or implied. *See Schneckloth,* 412 U.S. at 225–26, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. This test balances the competing interests of legitimate and effective police practices against our society's deep fundamental belief that the criminal law cannot be used unfairly. *See id.* at 224–25, 93 S.Ct. at 2046–47, 36 L.Ed.2d at 861. Thus, the concept of voluntariness which emerges as the test for consent represents a fair accommodation of these interests and values. *See id.* In the end, the inquiry becomes a question of fact based upon the totality of the relevant circumstances. *See id.* at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. The State is required to establish the consent was voluntary by a preponderance of the evidence. *State v. Garcia,* 461 N.W.2d 460, 462 (Iowa 1990).

Two questions often arise when the government relies on consent as an exception to the warrant requirement to search a home. The first question is whether the consent was given. The second is whether it was voluntary. The first question turns on whether the defendant manifested his or her consent, while the second question examines the validity of the consent given.

A number of factors have been developed to help determine the validity of the consent given. These factors consider both the circumstances surrounding the consent given and the characteristics of the defendant. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. None of the factors, however, are individually controlling in most instances, but must be considered in combination with all of the circumstances. *See id.* at 227, 93 S.Ct. at 2047, 36 L.Ed.2d at 862; *United States v. Bye,* 919 F.2d 6, 8–9 (2d Cir.1990). These factors include knowledge by the defendant of the right to refuse to consent. *Schneckloth,* 412 U.S. at 226–27, 93 S.Ct. at 2047, 36 L.Ed.2d at 862; *State v. Lamp,* 322 N.W.2d 48, 53 (Iowa 1982), *overruled on other grounds by State v. Heminover,* 619 N.W.2d 353 (Iowa 2000). Another factor is whether police asserted any claim of authority to search prior to obtaining consent. *See Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797, 801–02 (1968) (consent not voluntary when official claims he possesses a search warrant); *State v. Hatter,* 342 N.W.2d 851, 854 (Iowa 1983) (mere acquiescence to a search in the face of a claim of authority does not establish voluntary consent). The show of force or other types of coercive action by police are additional factors to consider. *See State v. Holland,* 389 N.W.2d 375, 381 (Iowa 1986). The use of deception by police without a justifiable and reasonable basis is also considered. *State v. Ahart,* 324 N.W.2d 317, 319 (Iowa 1982). Furthermore, a threat by police to obtain a search warrant and forcibly execute it is a factor to consider when the police lack a sufficient basis to obtain a warrant. *See State v. Owens,* 418 N.W.2d 340, 343–44 (Iowa 1988). The existence of illegal police action just prior to the time the consent is given is also an important factor. *See State v. Howard,* 509 N.W.2d

**2.** The other well-recognized exception to the warrant requirement for the search of a home is exigent circumstances. *See Steagald v. United States,* 451 U.S. 204, 211–12, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38, 45 (1981). There is no claim made of any exigent circumstances in this case to justify a warrantless entry.

764, 767–68 (Iowa 1993) (considered police officer's promises of leniency). Other factors are also considered. *See generally* 3 Wayne R. LaFave, *Search and Seizure* § 8.2, at 634–713 (3d ed.1996) [hereinafter LaFave] (discussing factors bearing upon the validity of consent).

## A. "Knock and Talk Encounter."

In this case, we begin our analysis of the surrounding circumstances by considering the general investigative procedure utilized by the police which culminated in the consent given by Reinier to search her house. This procedure was characterized by police as a "knock and talk" investigation, which involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house. *See United States v. Cruz,* 838 F.Supp. 535, 537 (D.Utah 1993). If successful, it allows police officers who lack probable cause to gain access to a house and conduct a search. *See United States v. Miller,* 933 F.Supp. 501, 505 (D.N.C.1996).

The "knock and talk" procedure has generally been upheld as a consensual encounter and a valid means to request consent to search a house. *See United States v. Cormier,* 220 F.3d 1103, 1110–09 (9th Cir.2000); *United States v. Taylor,* 90 F.3d 903, 909 (4th Cir.1996); *United States v. Kim,* 27 F.3d 947, 951 (3d Cir.1994); *United States v. Tobin,* 923 F.2d 1506, 1511–12 (11th Cir.1991); *Cruz,* 838 F.Supp. at 543; *State v. Green,* 598 So.2d 624, 626 (La.Ct.App.1992); *State v. Land,* 106 Or.App. 131, 806 P.2d 1156, 1157–59 (1991). *But see United States v. Jerez,* 108 F.3d 684, 691–93 (7th Cir.1997). The general response to the procedure has been summarized as follows:

> Absent express orders from the person in possession against any possible tres-

pass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964). Yet, when consent to search is obtained as a result of the "knock and talk" investigative encounter, the validity of the encounter ultimately hinges on the voluntariness of the consent given. *See Miller,* 933 F.Supp. at 505. Thus, the specific circumstances surrounding the "knock and talk" procedure become part of the totality of the circumstances to consider in determining if the consent eventually given was voluntary. *See id.*

■ Reinier claims the particular "knock and talk" procedure utilized by police in this case did not result in a consensual encounter, and her specific consent to search given to police officers was not voluntary. She asserts the police entered the porch of her home without her permission, and used intimidation and coercion to elicit her consent to search the house. Thus, we must not only consider the validity of the consent given to search, but also whether there was consent for the officers to initially enter the home.

■ A search occurs under the Fourth Amendment any time the government intrudes upon a person's legitimate expectation of privacy. *State v. Breuer,* 577 N.W.2d 41, 45 (Iowa 1998). If Reinier had a reasonable expectation of privacy in the porch of her home, the entry by police after Reinier opened the door could only be reasonable under the Fourth Amendment if she gave consent.

The porch of Reinier's house was just like any other portion of her house. It had glass-encased windows covered with blinds. The entrance to the porch had a solid wood door with a deadbolt lock and a screen door. Reinier stored personal belongings in the porch and kept the wood door locked at night. These circumstances reveal Reinier maintained an expectation of privacy which society clearly recognizes as reasonable. Thus, entry into the area by police constituted a search under the Fourth Amendment, and we must determine if consent was given to enter the porch based on the manner Reinier opened the door after the officers knocked on it.

### B. Consent to Enter Home.

■ Consent does not necessarily need to be given verbally. *State v. Phillips,* 218 Wis.2d 180, 577 N.W.2d 794, 802 (1998). It may be found not only by words, but by gestures and non-verbal conduct. *Id.; United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976); *see United States v. Donlon,* 909 F.2d 650, 655 (1st Cir.1990), *overruled on other grounds by Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *United States v. Turbyfill,* 525 F.2d 57, 59 (8th Cir.1975); *People v. James,* 19 Cal.3d 99, 137 Cal.Rptr. 447, 561 P.2d 1135, 1138–39 (1977); *State v. Dawson,* 233 Mont. 345, 761 P.2d 352, 356–57 (1988). *But see State v. Harris,* 642 A.2d 1242, 1246–47 (Del.Super.Ct.1993). The officers in this case could not recall if they actually engaged in any conversation with Reinier before they stepped onto the porch, but felt she invited them into the porch because it was cold outside and she opened the door wide in response to their knock. The officers acknowledged they did not identify themselves as police officers or announce their business before stepping onto the porch.

■ The act of opening a door in response to a knock could under certain circumstances constitute consent. *Griffin,* 530 F.2d at 743 (leaving door open and stepping back was invitation for officers to enter); *Turbyfill,* 525 F.2d at 59 (opening door and stepping back constitutes implied invitation to enter); *Dawson,* 761 P.2d at 356–57 (same). *But see Harris,* 642 A.2d at 1246–47 (shrugging of shoulders insufficient gesture of consent). However, the officers in this case were unable to recall the specific details of the event that would support a finding of consent. The State carried the burden of proof on this issue, and the evidence was insufficient to objectively show Reinier consented by opening the door. In fact, the officers acknowledged Reinier appeared surprised when they entered the porch without an oral request. This reaction was understandable and does not support consent. It would be more reasonable for an occupant of the home to wait for a stranger at the door to be identified before inviting the person into the home, especially during the nighttime hours, just as it would be reasonable for two strangers to identify themselves and ask to be invited in before stepping into the house. *See United States v. Shaibu,* 920 F.2d 1423, 1427–28 (9th Cir.1990) (no implied consent where defendant's conduct was not preceded by a police request for admission into residence). We conclude the initial entry into the home by the police officers was not consensual and was unreasonable under the Fourth Amendment.

■ Our determination that the initial entry by police into the porch was unreasonable becomes a factor to consider in determining whether the subsequent search consented to by Reinier was voluntary.[3] Although the illegal entry was lim-

---

**3.** The illegal action by the police in entering the porch during the "knock and talk" proce-

ited to the porch and did not directly contribute to the subsequent consent, it did imply authority to enter the home. It "had a quality of purposefulness." *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 428 (1975). Thus, we must consider the impact of this factor on the subsequent consent given by Reinier for the officers to search the remainder of the house.

■■■ In examining the presence of coercive tactics to determine the voluntariness of the consent to search a house, it is important to take subtle police actions into account as well as direct actions. The form of coercion which bears on the voluntariness of consent, whether direct or implied, is of no consequence. *Griffin,* 530 F.2d at 742; *see Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48, 36 L.Ed.2d at 862–63 (consent not voluntary when a product of duress or coercion, either expressed or implied). "Subtle coercion, in the form of an assertion of authority . . . by the law enforcement officers [can] make what appears to be a voluntary act an involuntary one." *Griffin,* 530 F.2d at 742; *see Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2049, 36 L.Ed.2d at 864.

The illegal initial entry into the house was limited to the area of the porch and did not immediately precede the subsequent consent to search the house. On the other hand, the illegal entry subtly implied authority by police. It gave the impression the police were authorized to act in the manner that they did. More importantly, the illegal entry must be considered in conjunction with the events that followed.

## C. Other Factors Bearing on Voluntariness of Consent.

Once inside the porch, the police explained to Reinier that they preferred to investigate drug complaints by simply looking around the home instead of getting a warrant. This explanation tended to imply that the police were authorized to act in a manner consistent with their usual method of operation. *See United States v. Pena–Saiz,* 161 F.3d 1175, 1177–78 (8th Cir.1998) (consent to search not voluntary when officers stopped defendant at airport without reasonable suspicion and said "This is what we do. We talk to people, we search people's bags, we pat-search people. This is what we do every day."). It implied the search was an authorized part of the normal overall investigative encounter. Thus, prior to the time Reinier gave her consent, the police not only asserted authority to enter the house but they also asserted authority to search. These two factors combine to weigh

---

dure actually requires a dual analysis. When a claim of a consensual search is preceded by illegal police action under the Fourth Amendment, the government must not only show the voluntariness of the subsequent consent under the totality of the circumstances, but must also establish a break in the illegal action and the evidence subsequently obtained under the so-called "fruit of the poisonous tree" doctrine. *United States v. Melendez–Garcia,* 28 F.3d 1046, 1053 (10th Cir.1994); *see* 3 LaFave § 8.2(d), at 655–56. While the two tests overlap, they can produce different results and must be considered independently. 3 LaFave § 8.2(d), at 655–56. The government must show any taint from the illegal search has been purged or attenuated not only because of the possible effect on the voluntariness of the defendant's consent, but also to effectuate the exclusionary rule. *Melendez–Garcia,* 28 F.3d at 1054. In this case, because we conclude the consent was not voluntary under the totality of the circumstances, it is unnecessary for us to additionally consider whether there was a break in the illegal entry and the subsequent consent. *See Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416, 424 (1975) (consent to search following illegal seizure is valid only if the evidence is found by means sufficiently distinguishable so as to purge the primary taint).

against a finding of voluntary consent. The same purposefulness projected by the illegal entry into the home continued to be projected by the officers' explanation of their standard procedure of operation. The actions by police can be best explained as a means directed to obtain acquiescence to search rather than the need for police to get out of the cold or for homeowners to know the preferred method of a police investigation. Additionally, there is another factor which weighs against a finding that the consent was voluntary.

The officers told Reinier prior to obtaining her consent that they were not looking for small quantities of drugs but "meth labs" and "major dealers." These comments bear upon the voluntariness of the consent because they are limitations on the nature of the crime under investigation and the objects sought by the search. *See* 3 LaFave § 8.2(n), at 707. The comments also tend to minimize the seriousness of possessing drugs for personal use or casual sales, and subtly create a false belief that no adverse consequences will result from a search if there is no meth lab in the house and the occupants are not major dealers. *Howard*, 509 N.W.2d at 766–67 (consent to search was involuntary where officer told defendant he was only interested in retrieving property, not using it as evidence for prosecution). These comments by police constitute a subtle form of deception with no reasonable basis.

There is other evidence which tends to support voluntary consent. Reinier's consent was preceded by an acknowledgement that drugs could be found in the house. *See* 3 LaFave § 8.2(g), at 676. Furthermore, the officers did not mislead Reinier when they told her, after she acknowledged that drugs were in the house, that they had probable cause to apply for a search warrant. Moreover, Reinier signed a written consent form. Yet, the acknowl-

edgement of the presence of drugs and the written consent came after the officers had entered the house uninvited, explained their normal procedure for investigating drug complaints, and indicated drugs kept for personal use were not the subject of the search.

Considering the totality of the circumstances, we conclude the State failed to establish the consent to search was voluntary. In balancing the interests between effective and fair law enforcement, the legitimate practice of investigating criminal complaints by a "knock and talk" encounter can be successfully accomplished without the subtle coercive actions engaged in by police in this case. Police can request consent to enter and search a home in the course of investigating a complaint without intimidation, implied authority, or minimizing the consequences. We think the fair accommodation between the interest in effective law enforcement and our fundamental belief in fair law enforcement procedures requires this conclusion. Additionally, the legitimacy of the consent to search obtained from the occupant of the house during the course of a "knock and talk" encounter can be greatly enhanced by the absence of such conduct.

### IV. Conclusion.

We conclude the search conducted by the police officers did not satisfy the consent exception to the warrant requirement and was done in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. We vacate the decision of the court of appeals, reverse the decision of the district court, and remand the case to the district court for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT**

**JUDGMENT REVERSED AND REMANDED.**

All justices concur except CARTER and NEUMAN JJ., who dissent.

CARTER, Justice (dissenting).

I dissent.

Irrespective of whether the entry of the police officers onto the enclosed porch area was without defendant's consent, I am convinced that the record fully supports the district court's finding that the subsequent entry into the home's living area was made with her consent.

The type of construction that features an enclosed porch placed as a buffer to entry into the living area of a home is quite common among older homes in this state. Such porches serve as a place where conversations may be had with delivery persons, peddlers, bill collectors, and others who come to the house with the intention of briefly conversing with the occupants. The entry onto the porch, which is criticized in the majority opinion, occurred in Iowa in December. It does not seem out of the ordinary that the discussions between the police and the defendant took place inside the enclosed porch area rather than through an open door, with the police standing in the cold.

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Court discussed the element of voluntariness in the consent-to-search context. In discussing its past decisions, involving that issue, the Court stated:

> [I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable.

*Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2051, 36 L.Ed.2d at 866. There is no evidence that the officers who engaged defendant in conversation on the porch employed any force. Nor did they issue any threats other than to advise her that if she did not consent they would seek a warrant. The message which that statement conveys is that the police had no right of entry without a warrant. This negates any suggestion that their entry into the living portion of the home was under claim of lawful authority.

Because I find that the challenged entry into defendant's home was freely consented to, I would affirm the decision of the court of appeals and the judgment of the district court.

NEUMAN, J., joins this dissent.